Justice Alito,
concurring in part and concurring in the judgment.
I join the opinion of the Court, except for Part II-B-2, which might be read to suggest that the tax at issue here would be permitted under the Tonnage Clause if the tax were a property tax levied in the same manner on other personal property within the jurisdiction. It is sufficient for present purposes that the Valdez tax is not such a personal *20 property tax and therefore, even if the Tonnage Clause permits a true, evenhanded property tax to be applied to vessels, the Valdez tax is an unconstitutional duty of tonnage.
Justice Stevens, with whom Justice Souter joins, dissenting.
The Tonnage Clause prohibits the States and their political subdivisions from charging ships for the privilege of using their ports. Because this case does not involve such a charge, I respectfully dissent.
I
The Tonnage Clause commands that “No State shall, without the Consent of Congress, lay any Duty of Tonnage.” U. S. Const., Art. I, § 10, cl. 3. As the Court asserts, the purpose of the Clause is to prevent States with convenient ports from abusing the privileges their natural position affords. See ante, at 7. Thus, the pertinent inquiry in determining whether an exaction violates the Clause’s prohibitions is whether the charge is “ ‘in its essence a contribution claimed for the privilege of arriving and departing from a port.’” Transportation Co. v. Wheeling, 99 U. S. 273, 283-284 (1879) (quoting Cannon v. New Orleans, 20 Wall. 577, 581 (1874)); see Clyde Mallory Lines v. Alabama ex rel. State Docks Comm’n, 296 U. S. 261, 265-266 (1935). In applying that principle, we have been cognizant of its limits.
By its terms, the Tonnage Clause prohibits States from imposing a duty on ships based on their internal cubic capacity, see id., at 265, and it similarly prohibits charges that “effect the same purpose” as a duty of tonnage — for instance, by imposing a duty based “on the number of masts, or of mariners, the size and power of the steam-engine, or the number of passengers which she carries,” Passenger Cases, 7 How. 283, 458-459 (1849) (opinion of Grier, J.). By contrast, charges levied for other purposes are outside the Clause’s *21 reach. This Court has often approved charges for services rendered to ships to ensure their safe and convenient use of a port. See Clyde Mallory, 296 U. S., at 266-267. And the federal interest in protecting access to the ports generally does not prevent States from charging shipowners those taxes and fees that the States are also authorized to levy on other property. See Wiggins Ferry Co. v. East St. Louis, 107 U. S. 365, 375, 376 (1883) (upholding a “license tax” “laid upon the business of keeping a ferry”); Wheeling, 99 U. S., at 279 (upholding a property tax on ships).
More than a century ago, we noted that it was “too well settled to admit of question that taxes levied by a State, upon ships or vessels owned by the citizens of the State, as property, based on a valuation of the same as property, to the extent of such ownership, are not within the prohibition of the Constitution.” Ibid. Just as “[d]raymen may be compelled to pay a license tax on every dray owned by them, hackmen on every hack, [and] tavernkeepers on their taverns in proportion to the number of the rooms which they keep for the accommodation of guests,” so too can a State charge the operator of a ferry a “tax upon the boats which he employs.” Wiggins Ferry, 107 U. S., at 375. “[V]essels of all kinds are liable to taxation as property in the same manner as other personal property owned by citizens of the State.” Wheeling, 99 U. S., at 284; State Tonnage Tax Cases, 12 Wall. 204, 212-213 (1871).
From Wheeling and the State Tonnage Tax Cases, two principles emerge regarding the circumstances under which States may levy property taxes on ships. First, the State seeking to levy the tax must show that the ship has sufficient contacts with the jurisdiction to establish a tax situs there. In our earlier cases, the existence of the situs was determined by the citizenship of the ship’s owner, see Wheeling, 99 U. S., at 279; State Tonnage Tax Cases, 12 Wall., at 213, but a tax situs can also be created by a property’s substantial *22 contacts with a jurisdiction.[1] The requirement of a tax situs serves to distinguish property taxes from fees charged for the privilege of entering a port, which the Court has consistently found to violate the prohibition against duties of tonnage. See, e. g., Cannon, 20 Wall., at 581 (holding unconstitutional “a tax upon every vessel which stops” in the city’s jurisdictional waters); Steamship Co. v. Portwardens, 6 Wall. 31, 33 (1867) (invalidating a tax imposed “upon every ship entering the port” and “collected upon every entry”).
Our cases also require that property taxes on ships, as with other property, be calculated based on the ship’s value. When a State levies a property tax on ships, the prohibition of the Tonnage Clause comes into play only if the ships are “not taxed in the same manner as the other property of the citizens, or where the tax is imposed upon the vessel as an instrument of commerce, without reference to the value as property.” Wheeling, 99 U. S., at 284. Although the meaning of Wheeling’s “same manner” language is not immedi *23 ately apparent, the remainder of the opinion emphasizes the importance of the method by which the tax on the petitioner’s ships was calculated — i. e., “based on a valuation of the same as property” — rather than the city’s taxation of other property in the jurisdiction. Id., at 279; see id., at 284.
Our decision in the State Tonnage Tax Cases is to the same effect, as we held that taxes levied on ships “as property, based on a valuation of the same as property, are not within the prohibition of the Constitution,” but if States tax ships “by a tonnage duty, or indirectly by imposing the tax upon the master or crew, they assume a jurisdiction which they do not possess.” 12 Wall., at 213, 214 (emphasis in original). Indeed, each of the taxes challenged in that case was invalidated because it was “levied on the steamboats wholly irrespective of the value of the vessels as property, and solely and exclusively on the basis of their cubical contents.” Id., at 217; see id., at 224 (holding the tax unconstitutional because “the amount of the tax depends upon the carrying capacity of the steamboat and not upon her value as property”).[2] Thus, in both Wheeling and the State Tonnage Tax Cases, the method by which the challenged tax was calculated was essential to the Court’s determination of its validity.
The tax in this case has both of the critical characteristics of a legitimate property tax. It is undisputed that petitioner’s ships “are taxed based on their value, and only those [ships] that have acquired a taxable situs in Valdez are taxed.” 182 P. 3d 614, 622 (Alaska 2008). Accordingly, *24 I would uphold the Alaska Supreme Court’s decision sustaining the tax against petitioner’s Tonnage Clause challenge.
The plurality reaches the opposite conclusion because it reads Wheeling’s “same manner” language to impose a different limitation on the States’ power to tax ships. According to the plurality, “in order to fund services by taxing ships, a State must also impose similar taxes upon other businesses.” Ante, at 12. As discussed above, Wheeling and the State Tonnage Cases are better read to require that property taxes on ships be assessed based on the value of the ship rather than its tonnage. But even if the “same manner” requirement did not clearly refer to the method of calculating the tax, the phrase could not bear the weight the plurality places on it. And there is no other support in our cases or in the text of the Tonnage Clause for a rule that conditions a State’s exercise of its admitted authority to levy property taxes on ships upon its decision also to tax other property within its jurisdiction.
Under the plurality’s reading, the same tax could be a “Duty of Tonnage” in one instance and not in another depending on taxing decisions wholly outside the Clause’s reach. Far from being compelled by our earlier cases, this rule is in tension with our decisions noting the substantial flexibility States must be afforded in making taxing decisions and cautioning courts not to “subject the essential taxing power of the State to an intolerable supervision.” Ohio Oil Co. v. Conway, 281 U. S. 146, 159 (1930). That tension is compounded by the inevitable difficulty States will have in navigating the new rule, as the plurality does not suggest at what point a State can be satisfied that it has taxed enough other property that it may also tax ships without violating the Clause’s prohibitions.
In support of its understanding of the “same manner” requirement, the plurality asserts that the rule “helps to ensure that a value-related property tax differs significantly from a graduated tax on a ship’s capacity and that the former *25 is not simply a redesignation of the latter.” Ante, at 12. But our eases provide such assurance without resort to the plurality’s strained reading. Because States and their political subdivisions only have authority to tax property that has established a tax situs in the jurisdiction, they cannot levy such taxes on ships merely for the privilege of entering or leaving the port; much more substantial contact with the jurisdiction is required. See Valdez Municipal Code §3.12.020(0 (2008); Central R. Co. of Pa. v. Pennsylvania, 370 U. S. 607, 614-615 (1962). And it is that contact, rather than entry into the port, that provides the basis for taxing the ships. The tax situs requirement thus ensures that a State cannot avoid the proscriptions of the Tonnage Clause by redesignating a duty charged for the privilege of entering the port as an ad valorem tax.
The facts of this case illustrate the point. Most of petitioner’s ships spend 40 to 50 days per year in the Port of Valdez. See App. 32-45. “[A]s a group the tankers form a continuous presence in the city.” 182 P. 3d, at 623. The ships’ prolonged physical presence and extensive commercial activities in the city have a substantial impact on the city’s resources. On average, the ships’ presence adds 550 people to the population of Valdez, increasing the city’s total population by 10%. Those people, as well as the ships themselves, require numerous public services, including harbor facilities, roads, bridges, water supply, and fire and police protection. Ibid. As the Alaska Supreme Court concluded, the challenged tax is therefore a legitimate property tax levied to support the ships’ use of the city’s services. See ibid.
II
Even if the Tonnage Clause were properly understood to permit a jurisdiction to levy a tax on ships only when other property in the jurisdiction is also taxed, I would uphold the challenged tax. Although the tax applies only to ships, see *26 Valdez Municipal Code §3.12.020, other property in the city is also subject to taxation.
First, §3.12.022 imposes a value-based property tax on trailers, mobile homes, and recreational vehicles that are affixed to a site and connected to utilities. The plurality makes much of the requirement that the property be “‘affixed’ ” to a particular site, concluding that “Valdez in fact taxes those vehicles only when they constitute a form, not of personal property, but of real property.” Ante, at 13. But the taxability of property pursuant to §3.12.022 is determined in much the same way as the taxability of ships. “A trailer or mobile home is conclusively presumed to be affixed to the land” and may therefore be taxed if “it has remained at a fixed site for more than ninety days.” §3.12.022(C). Similarly, a shipowner can establish a tax situs in Valdez and thus be subject to taxation if its ship is “kept or used within the city for any ninety days or more.” § 3.12.020(C)(2)(c).[3] In both cases, the provision serves to impose a tax on property that has developed substantial contacts with the city. The plurality is thus wrong to conclude that ships have been singled out for taxation.
Valdez also “levie[s] a tax” on all property taxable under Alaska Statutes Chapter 43.56 at the same rate that applies to other property taxed by the city. Valdez Municipal Code § 3.28.010.[4] The tax is imposed on property used “primarily in the exploration for, production of, or pipeline transportation of gas or unrefined oil,” including machinery, equipment, pumping stations, powerplants, aircraft and motor vehicles, and docks and other port facilities. See Alaska Stat. *27 §§43.56.010, 43.56.210(5)(A) (2008). For several reasons, this tax is more significant than the plurality acknowledges. First, contrary to the plurality’s view, the tax appears to be a municipal tax. Valdez Municipal Code §3.28.010 states that the tax “is hereby levied” on “property taxable under Alaska Statutes Chapter 43.56,” which in turn states that “[a] municipality may levy” such taxes, § 43.56.010(b). The terms of these provisions indicate that the city has exercised its express authority to levy such taxes. Given the myriad types of property taxable under those provisions and the requirement of Valdez Municipal Code § 3.28.010 that the property be taxed “at the rate of taxation that applies to other property taxed by the city,” it seems clear that petitioner’s ships are taxed in the “same manner” as other property even as the plurality uses that term.
My view of the case would be the same even if the tax on property used in oil production were imposed by the State itself, as the plurality assumes. Whether the oil-production tax and the challenged tax are levied by the same unit of government has no relevance to the question whether the latter violates the Constitution. The restriction imposed by the Tonnage Clause is a command to the States limiting their inherent taxing authority as sovereigns. The States’ political subdivisions have no such inherent power and can levy taxes only to the extent authorized by the State. See 16 E. McQuillin, Law of Municipal Corporations §44.05, pp. 19-24 (rev. 3d ed. 2003); see also Wiggins Ferry, 107 U. S., at 375 (noting “[t]he power of [a State] to authorize any city within her limits to impose a license tax” on ferries). Indeed, this aspect of the relationship between States and their political subdivisions is reflected in Alaska Stat. § 43.56.010(b), which authorizes municipalities to levy certain taxes and prevents them from exempting particular property from taxation. Because the city’s power to levy taxes derives from the State, whether the city or the State levies the tax on oil-production property is constitutionally irrelevant.
*28 Finally, it bears mention that the result in this particular case does nothing to further the interests the Tonnage Clause was intended to protect. As the Court acknowledges, ante, at 7, the central purpose of the Clause is “to prevent the seaboard States, possessed of important ports of entry, from levying taxes on goods flowing through their ports to inland States,” Youngstown Sheet & Tube Co. v. Bowers, 358 U. S. 534, 556 (1959) (Frankfurter, J., dissenting in part). Port Valdez is at the southern terminus of the Trans Alaska Pipeline System, which carries oil extracted from Alaska's North Slope to Port Valdez where it is loaded onto oil tankers belonging to petitioner and others for transport to refineries in other States. Taxes imposed on ships exporting that oil have the same effect on commerce in oil as do taxes on oil-production property or the oil itself, and Alaska’s authority to impose taxes on oil and oil-production property is undisputed. From an economic or political point of view, there is no difference between Alaska’s geographical control over the area in which the oil is produced and the port from which it is exported. Accordingly, no federal interest is served by prohibiting Alaska or its political subdivisions from taxing the oil-bearing ships that are continually present in the State’s ports.
Ill
The Tonnage Clause permits a State to levy a property tax on ships whether or not it taxes other property. Were that not the case, the challenged tax would still be permissible because Valdez also taxes mobile homes, trailers, and a wide variety of property used in producing oil. Because the tax in my view does not run afoul of the prohibitions of the Tonnage Clause, I respectfully dissent.

 Previously, courts followed the common-law “home port” doctrine, pursuant to which a ship could be taxed only by the State in which its owner was domiciled. See Pullman’s Palace Car Co. v. Pennsylvania, 141 U. S. 18, 23-24 (1891). That doctrine has since “yielded to a rule of fair apportionment among the States,” permitting any jurisdiction with which a ship has had sufficient contacts to establish a tax situs to levy a property tax on the ship in proportion to the ship’s contacts with the jurisdiction. See Japan Line, Ltd. v. County of Los Angeles, 441 U. S. 434, 442-443 (1979); see also Standard Oil Co. v. Peck, 342 U. S. 382, 383 (1952). We have roundly rejected the doctrine in cases involving ships moving in interstate operations along the inland waters. See ibid. And in the context of ocean-going ships, we have referred to the doctrine as “‘anachronistic’” and all but “ ‘abandoned,’ ” noting that “to rehabilitate the ‘home port doctrine’ as a tool of Commerce Clause analysis would be somewhat odd.” Japan Line, 441 U. S., at 443. In light of these developments, it is odd indeed that The Chief Justice endeavors to distinguish Transportation Co. v. Wheeling, 99 U. S. 273 (1879), and the State Tonnage Tax Cases, 12 Wall. 204 (1871), as “applying] only to taxation of property owned by citizens of the State.” See ante, at 18 (opinion concurring in part and concurring in judgment).

 The Court seems to conflate these methods of calculating taxes on ships, as it asserts that “a tax on the value of such vessels is closely correlated with cargo capacity” and concludes that the tax in this case “depends on a factor related to tonnage.” Ante, at 10; see also ante, at 17 (opinion of Roberts, C. J.). This is contrary to our longstanding recognition that a ship’s capacity is not a proxy for its value: “[T]he experience of every one shows that a small steamer, new and well built, may be of much greater value than a large one, badly built or in need of extensive repairs.” State Tonnage Tax Cases, 12 Wall., at 224.

 A ship can also establish a tax situs in Valdez if it is usually kept or used within the city, travels to or within the city along regular routes, or is necessary to the conduct of substantial business in the city. § 3.12.020(C)(2):

 As the plurality notes, ante, at 13-14, Valdez did not raise this issue in state court, and the parties have provided only limited briefing on the issue.